**DRAFT**

Eric B. Fastiff (D.C. Bar No. 453854)
Nimish R. Desai
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Tel.:  (415) 956-1000
Fax:  (415) 956-1008

*Attorneys for Relator*

Case: 1:22−cv−01776   JURY DEMAND
Assigned To : Friedrich, Dabney L.
Assign. Date : 6/21/2022
Description: Gen. Civ. (E−DECK)

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES *ex rel.* USPI, LLC,<br><br>Plaintiff,<br><br>v.<br><br>UNIVERSITY OF CHICAGO, UNIVERSITIES RESEARCH ASSOCIATION, INC., FERMI RESEARCH ALLIANCE, LLC, and UCHICAGO ARGONNE, LLC<br><br>Defendants. | Case No.<br><br>**COMPLAINT**<br><br>False Claims Act, 31 U.S.C. § 3729 *et seq.*<br><br>**DEMAND FOR JURY TRIAL** |

RECEIVED

JUN 2 1 2022

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

2427669.2

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| I. | Statement of the Case | 1 |
| II. | Jurisdiction and Venue | 1 |
| III. | The Parties | 2 |
| IV. | Factual Allegations | 2 |
| | A. | The Fermilab Contract | 2 |
| | B. | The Fermilab Defendants' Failure to Comply with the Buy American Act and Related Requirements | 4 |
| | C. | The Fermilab Defendants' Failure to Comply with Contractual Cost Control Provisions | 9 |
| | D. | Systematic Management Failures in the Fermilab Defendants' Procurement Department | 10 |
| | E. | The Argonne Defendants' Failure to Comply with the Buy American Act and Related Requirements | 12 |
| V. | Claim for Relief | 14 |
| | First Claim for Relief | 14 |
| VI. | Prayer for Relief | 15 |
| VII. | Jury Demand | 16 |

Relator, on behalf of the United States of America, alleges as follows:

## I.    Statement of the Case

1.    This is an action brought by *qui tam* Plaintiff and Relator USPI, LLC on behalf of the United States to recover treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729 et seq. ("the FCA" or "the Act").

2.    This action arises from false claims for payment and false statements made by Defendants in connection with contracts for operation of the Government-owned laboratories known as Fermilab and Argonne National Laboratory. Both of these laboratories are operated by Defendant University of Chicago through its subsidiaries and partnerships.

3.    Defendants knowingly caused the Government to overpay under these contracts by failing to comply with material contract terms, including the Buy American Act, which places a preference on domestically-sourced goods, and contract clauses meant to contain costs. Had the Government known of these failures, it would not have paid claims submitted by Defendants, or would have paid substantially less.

## II.    Jurisdiction and Venue

4.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1345, and 3732. The Court may exercise personal jurisdiction over Defendants under 31 U.S.C. § 3732(a) because the False Claims Act ("FCA") authorizes nationwide service of process, at least one of the Defendants is located in this District, and Defendants are corporations, companies and partnerships that transact business in and have the required minimal contacts with the United States.

5.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)-(c) and 31 U.S.C. § 3732(a) because at least one Defendant is located in this District.

DRAFT

## III.   **The Parties**

6.      Relator USPI, LLC is incorporated under the laws of Wyoming. Its member is a participant in the government contract procurement industry. Relator is not aware of any "public disclosure" of these allegations, as defined in 31 U.S.C. § 3730(e)(4)(A). Further, Relator, by and through its membership, qualifies as an "original source" under § 3730(e)(4)(B) because Relator: (1) voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based prior to any purported public disclosure, and/or (2) has knowledge which is both direct and independent of any public disclosures to the extent any may exist, and voluntarily provided the information to the Government before filing this action.

7.      Defendant the University of Chicago ("UC") is an Illinois not-for-profit corporation with its headquarters in Chicago.

8.      Defendant Universities Research Association, Inc. is a not-for-profit with its headquarters in Washington, DC. It is comprised of research universities in the United States and abroad, including Defendant UC.

9.      Defendant Fermi Research Alliance, LLC ("FRA") is incorporated under the laws of Illinois and is headquartered in Batavia, Illinois. A partnership of Defendants UC and URA, FRA manages Fermi National Accelerator Laboratory (Fermilab), America's particle physics and accelerator laboratory.

10.      Defendant UChicago Argonne, LLC is incorporated under the laws of Illinois and is owned by Defendant University of Chicago, and manages Argonne National Laboratory.

## IV.   **Factual Allegations**

### A.      **The Fermilab Contract**

11.      Fermilab is a Government owned lab in Batavia, Illinois, specializing in particle physics.

DRAFT

12.     From 1967 to 2006, Defendant URA was the prime contractor to the U.S. Department of Energy for the creation and operation of Fermilab. In 2007, Defendant FRA, a joint partnership of Defendants UC and URA (together, the "Fermilab Defendants"), was selected to manage and operate Fermilab on behalf of the U.S. Department of Energy Office of Science.

13.     The University of Chicago plays an important role in the operation of Fermilab, including implementation of the Fermilab contract. As stated on the FRA website, "In 2007, the University continued its national laboratory stewardship role as co-manager of Fermilab with Universities Research Association, bringing decades of leadership and experience managing national laboratories. University of Chicago provides partnerships in academia, business and Government to help shape and amplify the powerful science programs at Fermilab."[1]

14.     The Fermilab contract start date was January 1, 2007, and it is scheduled to continue through December 31, 2023. Since the start date, DOE has paid out billions of dollars to the Fermilab Defendants.

15.     Per contract clause I.94A (DEAR 970.5216-7), reimbursements can be made only for amounts determined to be allowable and reasonable, and in accordance with 48 C.F.R. §§ 31.201-2 and 31.201-3, and DEAR 970.31. These regulations, in turn, condition reimbursement on compliance with all terms of the contract, including those set out in detail below. § 31.201-2(a)(4). Further, a cost is only "reasonable" if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business. *Id.* at 31.201-3(a).

---

[1] Fermi Research Alliance, available at https://fra-hq.org/about (last visited May 12, 2022).

DRAFT

16.     In addition, the contract requires the creation and implementation of Cost Accounting Standards, inclusive of a purchasing system that is intended to ensure compliance with contractual terms as they relate to acquisition and subcontracting. Clause I.46, 48 C.F.R. § 52.230-2 (Cost Accounting Standards); Clause I.128, DEAR 970.5244-1(g) and 48 C.F.R. § 52.225-1 (Contractor Purchasing System). Pursuant to 48 C.F.R. § 30.001, a contractor is noncompliant with cost accounting requirements if there is a failure in estimating, accumulating, or reporting costs to comply with applicable Cost Accounting Standards or consistently follow disclosed or established cost accounting practices (which includes its purchasing system).

17.     In connection with each request for payment, Fermilab submitted Form 1443, or its electronic equivalent. That form, in turn, requires a certification that the amounts requested were "prepared from the books and records of the above-named contractor in accordance with the contract" and is "correct," and that "the quantities and amounts involved are consistent with the requirements of the contract." Based on its certification of compliance, the Government reimburses the Fermilab Defendants for expenditures.

18.     Fermilab operates various projects and experiments, such as the Deep Underground Neutrino Experiment (DUNE) and the Proton Improvement Plan II (PIP-II). Each of these projects has a procurement manager, whose role is to plan out procurement purchases and logistics for the project. The procurement managers, in turn, interface with a central procurement department which executes the requested purchases and subcontracts, and more generally manages the contractually-required purchasing system.

B.      **The Fermilab Defendants' Failure to Comply with the Buy American Act and Related Requirements**

19.     At all relevant times, the Fermilab contract, through clause I.41, required compliance with the Buy American Act, 41 U.S.C. § 8301–8305 ("BAA"). The contract included

**DRAFT**

the contract clauses available at FAR § 52.225-1 and § 52.225-9, which incorporate the statutory

and regulatory requirements imposed by the BAA.

20.     Enacted in 1933, the BAA establishes certain Government contract procurement

restrictions that favor domestic sources over foreign ones, and is intended "to create jobs for

American workers and protect American industry." *U.S. v. Rule Indus., Inc.*, 878 F.2d 535, 538

(1st Cir. 1989).

21.     The BAA generally applies to (a) items of supply that are acquired from a

contractor for public use in the U.S. (known as end products), and also (b) items that a contractor

incorporates into the construction of a public work located in the U.S. (known as construction

materials).

22.     Procedurally, if a Government contractor believes a foreign purchase is necessary,

the contractor must first cross-check the article against a list of items at 48 C.F.R. § 25.104 that

are deemed domestically "non-available. 48 C.F.R. § 25.103(b)(1). If the article is on that list,

the foreign item purchase can proceed.

23.     If the article is not on that "non-available" list, 48 C.F.R. 25.103(b)(2) permits the

Government to make an individual determination of non-availability. Through, contract clause

I.128(g), the Government permits the Fermilab Defendants to make non-availability

determinations on items at or below $500,000, provided they comply with their approved

purchasing system.

24.     Those individual non-availability determinations must be in writing unless the

requirements of 48 C.F.R. 25.103(b)(3) are met, specifically: the acquisition was conducted

through use of full and open competition and was synopsized and published in the Government

Point of Entry (GPE) for a specified period (available at Sam.gov) pursuant to 48 C.F.R. § 5.201,

and despite those efforts, no domestic offer was received. The logic of this requirement is simple: if domestic sources are given a reasonable period of time to review and evaluate an acquisition, and yet make no offers, the contractor is free to pursue foreign sources. Further, these steps foster competition among potential suppliers and yield cost savings for the Government.

25.     The Fermilab Defendants were also obligated to meet a related set of requirements imposed by the World Trade Organization Agreement on Government Purchasing, known as the WTO-GPA. This international agreement places sources from certain countries on equal footing with domestic sources. Thus, a contractor could, in principle, select a source from a WTO-GPA signatory country over a domestic source, all other things being equal. Compliance with this requirement is essentially the same as that required under the BAA: acquisitions are synopsized and published (*i.e.*, advertised on Sam.gov) to solicit competition. 48 C.F.R. §§ 5.201, 25.408(a)(1), and 25.408(a)(2).

26.     As noted above, the Fermilab contract required an approved purchasing system that set out policies, procedures, and requirements to ensure compliance with contractual terms, including BAA and WTO-GPA. The Fermilab Defendants' policies and procedures identified the correct processes, and solely on that basis Defendants certified compliance with the relevant contractual and regulatory requirements.

27.     In fact, however, the Fermilab Defendants systematically failed to comply with these requirements. Defendants virtually never met the synopsizing and publication requirements, thereby depriving domestic and WTO-GPA sources of a full and fair opportunity to complete for Government dollars. In addition to thwarting the important policy objectives of

**DRAFT**

the BAA and WTO-GPA, Defendants' failure to publish acquisitions stifled competition and drove costs higher.

28.     The Defendants' acquisition personnel have admitted they do not follow the appropriate BAA publication procedures. Instead, those individuals stated that when tasked with a foreign purchase, Defendants claimed "nonavailability" as a matter of course without full and open competition required by § 25.103(b)(3), without synopsizing or publication in the GPE (Sam.gov) as required by § 25.408(a)(1) and (2), and without publicizing in compliance with the Buy American Act requirements in § 25.103(b)(3) or the WTO-GPA requirements in § 25.408(a)(1) and (2). To make matters worse, purchases were made inconsistently from contract specialist to contract specialist, demonstrating a systematic failure to follow Defendants' purchasing system.

29.     These failures were corroborated in additional ways. First, in meetings with acquisition personnel, they admitted that they were not familiar with, and had not even read, the relevant acquisition regulations.

30.     Second, the procurement manager for the Deep Underground Neutrino Experiment (DUNE) program, who was well versed with the relevant regulations, confirmed that purchases were routinely made without regard to the Fermilab Defendants' purchasing system and BAA or WTO-GPA requirements.

31.     Third, in a review of 40-50 foreign purchases across Fermilab's procurement portfolio, spanning 10-15 subcontracts and the prior four years, showed no evidence of publication, full and open competition, or any other signs of compliance with foreign purchase procedures documented in the files.

DRAFT

32.     Fourth, the Government's System for Award Management ("SAM"), available at sam.gov (formerly fbo.gov), shows the Defendants' procurement department was not complying with synopsizing and publishing requirements. In light of the sheer volume of purchases at Fermilab that would require publication (including because of BAA and WTO-GPA requirements), Defendants should have had thousands of items advertised in any given year. Yet, the actual number of SAM (sam.gov) postings was negligible in comparison. Likewise, when reviewed again in 2022, the website included just over 600 postings by Fermilab from 2005-2022, or approximately 30-40 each year.

33.     Fifth, the Acquisition Officer, who directed the Fermilab Defendants' procurement department, had no explanation for the BAA and WTO-GPA noncompliance.

34.     The total purchase value withheld from domestic sources is substantial: 3,000 foreign item purchases worth approximately $30 million annually.

35.     Examples of these foreign purchases made in violation of the BAA and WTO-GPA requirements include superconducting radio frequency cavities, niobium sheets, niobium tubes, temperature sensors, microscopes, pressure transducers, cavity strings, bare cavities, dressed cavities, magnets, superconducting magnets, solenoid magnets, power supplies, motors, magnetic shielding, transformers, motors, and cabling. Based on the nature of purchases at issue, many if not most of the foreign purchases could have been fulfilled by domestic sources, had Defendants' complied with the above requirements.

36.     The Fermilab Defendants' noncompliance with the BAA, WTO-GPA, and related contract terms was material, in that the Government would not have paid for purchases made in violation of those statutory requirements and contract terms or would have paid less for them had it known of the noncompliance.

2427669.2                                    -8-

DRAFT

C.    **The Fermilab Defendants' Failure to Comply with Contractual Cost Control Provisions**

37.    At all relevant times, the Fermilab contract included a series of requirements that Defendants pay competitive, negotiated prices for its purchases, thereby ensuring that the Government does not overpay when it reimburses Defendants. This includes contract clauses I.57, 48 C.F.R. § 52.244-5 (Competition in Subcontracting) and I.12C, 48 C.F.R. § 52.210-1 (Market Research).

38.    Most critically, the contract requires that Defendants shall maintain file documentation appropriate to the value of the purchase and adequate to establish the propriety of the transaction and the price paid. Defendants were thus to document the results of those efforts, both to ensure that the process had been followed, and that the subcontractor award costs were justified.

39.    Once again, while Defendants' purchasing system included the necessary policies and procedures for complying with these clauses, in practice, Defendants systematically failed to do so, as confirmed through a review of numerous purchases across programs and subcontracts.

40.    Defendants' systematic failures to follow these provisions violated the terms of the contract, rendered costs not "reasonable," fatally undermined the flexibly priced Fermilab contract (leaving the Government open to overpayments), and rendered false and fraudulent Defendants' claims for reimbursement to the Government. Had the Government known Defendants were not complying with these important cost containment features of the contract, it would not have approved the vouchers and claims submitted by Defendants or would have paid less for them. Not surprisingly, in light of these pervasive failures, Defendants have overseen staggering cost overruns on various projects.

DRAFT

### D.      Systematic Management Failures in the Fermilab Defendants' Procurement Department

41.     The failures above were symptoms of broader dysfunction in Defendants'

operation of the Fermilab contract. Overwhelmingly, Defendants' procurement department

operated in an inconsistent, mistake-ridden, and combative manner, resulting in Defendants not

meeting the requirements of contract clause I.8A, FAR 52.203-13(c)(2)(i) (Business Ethics and

Conduct), across the entirety of its purchasing operations.

42.     This dysfunction extended to the relationships between the procurement

department and Defendants' technical branches who needed to purchase items for their

programs. Controls to determine what needed to be planned, accomplished, processed,

administrated, and closed were non-existent, as were metrics for each of these functions. Adding

to the confusion was Defendant's failure to prepare required reports both pre- and post-award,

which then prevented effective management and oversight of purchases and contracts.

43.     Procurement department management fostered a tense, reactive environment.

Managers added last minute assignments to procurement managers' workloads, causing late and

early duty to what was already a six to seven day work-week, and rushed work as a result.

Defendants' Acquisition Officer withheld hiring of a highly qualified candidate strictly because

of personal disputes. The Defendants' Acquisition Officer often communicated critically in

Defendants' managers' meetings about the DOE Government client, making the verbatim

statement "the DOE Government representatives had never purchased anything." Defendants are

staffed with candidates unqualified and untrained in federal contracting; indeed, when

Defendants endeavored to create a document outlining the procurement department's collective

skills and education, they discarded it after realizing how little there truly was.

DRAFT

44.     When the necessary controls and reporting processes were developed by individuals working at Fermilab, they were not deployed broadly and were instead summarily swept under the carpet. Likewise, suggestions from the Defendants' own procurement managers were ignored time and again, resulting in acquisitions that "failed," in that they cost more or arrived later than they should have, and causing duress for the Government and the scientific community tied to Fermilab.

45.     Systematically, Defendants failed to perform acquisition planning and estimating except for those purchases that required direct Government oversight. Contrary to any sound procurement business practice (and contract requirements), negotiations were never performed by Defendants. These failures were confirmed by reviewing the relevant contract files, which showed none of the required documentation.

46.     Similarly, the Defendants' procurement computer system (enterprise business system) was poorly designed, allowing the input of final "estimates" after contract award, causing the impossible feat of estimates being identical to the final purchase amount for virtually every purchase, even in those situations where the requisition needed to be returned to the requestor for additional funds. This had the added impact of preventing identification and management of estimating deficiencies. As a result, Defendants have no reliable information on whether they accurately estimate subcontracts and acquisitions, further feeding into the persistent cost overruns at Fermilab.

47.     Financial reporting from Defendants' projects could only be accomplished using work breakdown structure numbers and activity numbers. Yet, Defendants' procurement enterprise business system did not even contain these identifiers, thus requiring a tedious, manual process of aligning purchases to projects. For over one year, numerous requests from

Defendants' project staff and procurement managers to add these identifiers to the system went unanswered, causing unnecessary workload for reconciliation related to financial management and invoicing.

48.     Similar data matching failures plagued an internal bidding program Defendants developed at the cost of approximately $1 million dollars. It was unable to match Defendants' purchases with manufacturers' part numbers and nomenclatures, making it impossible to check for price fairness or to compare the same part outside of the Defendants' system. Indeed, the system could not even match parts to common systems such as Amazon, Grainger, or Staples. This system was tested by attempting to compare costs of a commonly-used notebook at Fermilab, a simple request which Defendants' system could not process. Defendants' procurement managers complained of this same issue, and their suggestions to add fields for part number and nomenclature went unanswered.

49.     Due to these systemic and interrelated failures, the Government necessarily reimbursed claims that were in violation of material terms of the contract, and paid more for all manner of purchases than it would have had Defendants taken reasonable measures to ensure contract compliance.

### E.     The Argonne Defendants' Failure to Comply with the Buy American Act and Related Requirements

50.     Argonne National Laboratory is a multidisciplinary science and engineering research center in Lemont, Illinois. Defendant the University of Chicago manages and operates the laboratory through its subsidiary, Defendant UChicago Argonne, LLC (together, the "Argonne Defendants"). The Department of Energy awarded the contract on July 31, 2006, and it is set to end in 2025 or 2026. Since the start date, DOE has paid out billions of dollars to the Argonne Defendants.

51.     In connection with each request for payment, the Argonne Defendants submitted Form 1443, or its electronic equivalent. That form, in turn, requires a certification that the amounts requested were "prepared from the books and records of the above-named contractor in accordance with the contract" and is "correct," and that "the quantities and amounts involved are consistent with the requirements of the contract." Based on its certification of compliance, the Government reimburses the Argonne Defendants for expenditures.

52.     At all relevant times, the Argonne contract required compliance with the BAA, and included the contract clauses available at FAR § 52.225-1, -8, -9, -11, -13, and -21, which incorporate the statutory and regulatory requirements imposed by the BAA. The Argonne Defendants were also obligated to meet the WTO-GPA requirements.

53.     However, the Argonne Defendants appear not to have complied with key provisions of the BAA and WTO-GPA, in particular the synopsizing and publication requirements set out above.

54.     Notably, both Fermilab and Argonne National Laboratory are operated by Defendant University of Chicago. Like Fermilab, Argonne conducts research into a variety of advanced physics topics, including nuclear physics. It also conducts research in the areas of chemistry, energy storage, and materials sciences, among others. On information and belief, including specifically the breadth of Argonne's research work, the size of its contract (valued at over $12 billion since inception), and Relator's experience with the procurement needs of a similar national laboratory (Fermilab), Argonne made substantial purchases from foreign sources.

55.     Nonetheless, the Government's System for Award Management ("SAM"), available at sam.gov (formerly fbo.gov), strongly indicates that the Argonne Defendants'

**DRAFT**

procurement department was not complying with synopsizing and publishing requirements required by the BAA and WTO-GPA. From 2002-2022, the number of SAM (sam.gov) postings by Argonne was about 1,200, or 60 per year, far less than would be expected for a laboratory of Argonne's size and scope of work.

56.     The Argonne Defendants' noncompliance with the BAA, WTO-GPA, and related contract terms was material, in that the Government would not have paid for purchases made in violation of those statutory requirements and contract terms or would have paid less for them had it known of the noncompliance.

## V.     Claim for Relief

### First Claim for Relief
### False Claims Act, 31 U.S.C. § 3729
### Against All Defendants

57.     Relator re-alleges and incorporates the allegations in the preceding paragraphs of this Complaint as if fully set forth herein.

58.     This is a civil action brought by Relator, on behalf of the United States of America, against Defendants under the False Claims Act, 31 U.S.C. § 3730(b)(1).

59.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented false or fraudulent claims for payment or approval to the Government, in violation of 31 U.S.C. § 3729(a)(1)(A).

60.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false

DRAFT

or fraudulent records and/or statements to get false or fraudulent claims to the Government, in violation of 31 U.S.C. § 3729(a)(1)(B).

61.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the Government, in violation of 31 U.S.C. § 3729(a)(1)(G).

62.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, concealed or improperly avoided or decreased, and may still be concealing or improperly avoiding or decreasing, obligations to pay or transmit money or property to the Government, in violation of 31 U.S.C. § 3729(a)(1)(G).

63.    The United States, unaware of the falsity of the claims and/or statements made or caused to be made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for false or fraudulent claims.

64.    As a result of Defendants actions as set forth above, the United States has been, and may continue to be, severely damaged.

## VI.    **Prayer for Relief**

65.    WHEREFORE, Relator, on behalf of the United States, demands and prays that judgment be entered in favor of the United States and against Defendants, jointly and severally, as follows:

a.    Defendants pay an amount equal to each and every false or fraudulent claim or retention of funds, multiplied as provided for in 31 U.S.C. § 3729(a)(1), plus a civil penalty of not less than $5,000 or more than $11,000 per claim or violation as provided by

**DRAFT**

31 U.S.C. § 3729(a)(1), as adjusted by the Federal Civil Penalties Inflation Adjustment Act of

1990;

   b. Defendants cease and desist from violating the False Claims Act,

31 U.S.C. §§ 3729 *et seq.*;

   c. The United States and Relator be granted all costs, pre- and post-judgment

interest and all such further relief as the Court deems just and proper.

   d. Relator be awarded the maximum amount allowed pursuant to 31 U.S.C.

§ 3730(d); and

   e. Relator be awarded all costs of this action, including attorneys' fees,

expenses, and costs pursuant to 31 U.S.C. § 3730(d).

## VII. <u>Jury Demand</u>

   Pursuant to Federal Rule of Civil Procedure 38(b), Relator demands a jury trial for all

claims and issues so triable.

Dated: June 15, 2022

        *Eric B. Fastiff*

        Eric B. Fastiff (D.C. Bar No. 453854)
        Nimish R. Desai
        Lieff Cabraser Heimann & Bernstein, LLP
        275 Battery Street, 29th Floor
        San Francisco, CA  94111-3339
        Tel.:  (415) 956-1000
        Fax:  (415) 956-1008

        *Attorneys for Relator*

**DRAFT**

Eric B. Fastiff (D.C. Bar No. 453854)
Nimish R. Desai
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Tel.:  (415) 956-1000
Fax:  (415) 956-1008

*Attorneys for Relator*

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| [UNDER SEAL], | Case No. |
| Plaintiff(s), | **COMPLAINT** |
| v. | False Claims Act, 31 U.S.C. § 3729 *et seq.* |
| [UNDER SEAL], | **DEMAND FOR JURY TRIAL** |
| Defendant(s). | |